Chris A. CROSBY, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 8, 2002.

Supreme Court of Delaware.

Submitted: April 8, 2003.
Decided: May 30, 2003.

Todd E. Conner, Esquire and James D. Nutter, Esquire, Assistant Public Defenders, Wilmington, Delaware, for appellant.

Kim E. Ayvazian, Esquire, Department of Justice, Georgetown, Delaware, for appellee.

Before VEASEY, Chief Justice, WALSH,[1] HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

PER CURIAM.

The defendant-appellant, Chris A. Crosby, has challenged his life sentence as a habitual offender, following his conviction for Forgery in the Second Degree. According to Crosby, that sentence is grossly disproportionate to the severity of his offense, and, therefore, prohibited by the Eighth Amendment to the United States Constitution. This Court remanded Crosby's appeal to the Superior Court twice for additional proceedings.

In response to the most recent remand, the Superior Court concluded that "Crosby is serving a life sentence calculated on the basis of 45 years." The Superior Court reached that determination on the basis that a life sentence under section 4214(a)[2] of the habitual offender statute is to be considered as a fixed term of 45 years, pursuant to section 4346(c).[3] We have concluded that the Superior Court's construction of section 4214(a) is correct.

We have also concluded that Crosby's life sentence of 45 years violates the

Eighth Amendment. In doing so, we have considered the most recent opinions on that subject, which were issued by the United States Supreme Court within the last few months.[4] Accordingly, the judgment of the Superior Court is reversed.

### Facts

On May 31, 2001, Crosby was arrested on several misdemeanor drug offenses. When he was being questioned by a police officer, he provided a false name, John Crosby, and a false date of birth. He also signed a State Bureau of Identification fingerprint card, an official document, using the name John Crosby. When the police officer subsequently learned that the defendant's real name was Chris Crosby, he arrested him for Forgery in the Second Degree and Criminal Impersonation.[5]

On September 17, 2001, Crosby, represented by counsel, entered a guilty plea to Forgery in the Second Degree and Criminal Impersonation. During the guilty plea colloquy, Crosby acknowledged that the forgery conviction qualified him as a habitual offender under title 11, section 4214(a) of the Delaware Code. Crosby also indicated he was aware that he could be sentenced up to life imprisonment.

The State subsequently filed a motion to have Crosby declared a habitual offender under title 11, section 4214(a) of the Delaware Code. The State cited five previous felonies: (1) Burglary in the Third Degree (IN98–11–0691) in 1999; (2) Forgery in

---

1. Sitting by designation pursuant to Del. Const., art. IV, §§ 12 and 38 and Del.Code Ann. tit. 29, § 5610.

2. Del.Code Ann. tit. 11, § 4214(a).

3. Del.Code Ann. tit. 11, § 4346(c).

4. *See Lockyer v. Andrade,* —— U.S. ——, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Ewing v. California,* —— U.S. ——, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003).

5. Crosby was indicted on July 2, 2001 on charges of Forgery in the Second Degree in violation of title 11, section 861 of the Delaware Code; Criminal Impersonation in violation of title 11, section 907(1) of the Delaware Code; Possession of a Hypodermic Needle and Syringe in violation of title 16, section 4757 of the Delaware Code; and Possession of Drug Paraphernalia in violation of title 16, section 4771 of the Delaware Code.

the Second Degree (IN94–06–0144) in 1995; (3) Possession of a Deadly Weapon by a Person Prohibited (IN88–11–1556) in 1989; (4) Possession with Intent to Deliver (IN89–07–0672) in 1989; and (5) Burglary in the Second Degree (IN86–02–0421) in 1986. The Superior Court declared Crosby a habitual offender by order dated October 1, 2001.

At the sentencing hearing on December 7, 2001, the State recommended a sentence "close to the ten-year range." The Superior Court instead sentenced Crosby to life on the forgery conviction, as a habitual offender, under section 4214(a); followed by six months at Level III supervision; and one year at Level V on the criminal impersonation conviction, suspended for one year at Level II. This is Crosby's direct appeal.

### Crosby's Sentence Natural Life or 45 Years

The sentencing judge's first remand report to this Court reflected that Crosby's life sentence was based, in part, on the judge's belief that Crosby would be "eligible for a significant sentence diminution by earning good time." The sentencing judge stated that Delaware law equates Crosby's life sentence, as a habitual offender under title 11, section 4214(a) of the Delaware Code, to a sentence of 45 years. Therefore, the sentencing judge concluded that the availability of earning good time credit means that Crosby will be eligible for conditional release before the expiration of the sentence, i.e., before the end of Crosby's natural life. The sentencing judge reported that he relied on this interpretation of the applicable statutes when he sentenced Crosby to life in prison, expressly stating: "Delaware's statute permitting good/time conditional release was a factor I took into account."

Because of an apparent conflict with this Court's prior holding in *Jackson*, we remanded Crosby's case a second time and asked the sentencing judge to state whether Crosby's sentence was *either* a life sentence or a 45–year sentence. In response to that second remand, the sentencing judge wrote that the question could not be answered "either or" because "Crosby is serving a life sentence calculated on the basis of 45 years." The sentencing judge also concluded that Crosby's Eighth Amendment rights were not violated.

■ This Court's ultimate resolution of Crosby's Eighth Amendment argument is dependent, in part, upon whether Crosby's life sentence as a habitual offender under section 4514(a) is considered to be a term of 45 years, with the possibility of earning a substantial sentence diminution through good time credits; or is considered to be a natural life sentence with no possibility of reduction or release prior to death. The sentencing provisions of the Delaware criminal justice system are found in several different statutes that have been separately enacted and amended on numerous occasions over the last few decades. Thus, this Court must apply and, if possible, reconcile two fundamental principles of statutory construction. First, we must read all of the statutes, as amended, *in pari materia* to accomplish the intentions of the General Assembly. Second, we must, if possible, construe the applicable statutes in a manner that causes them to operate in a manner that comports with the requirements of the Eighth Amendment to the United States Constitution.

### Habitual Criminal Statutory History

We begin our inquiry with an examination of the applicable sentencing statutes' legislative history. Delaware's first habitual criminal statute was enacted in 1953. It provided a single basis for a habitual criminal designation. The statute applied only to four-time convicted felons. That statute made no distinction as to the seri-

ousness of either the prior convictions or the most recent triggering felony conviction. Enacted effective July 15, 1953, 49 Del.Laws, c. 413 provided:

Section 1. Chapter 1, Title 11, Delaware Code of 1953 is amended by adding the following new section:

§ 107. Habitual criminal; fourth offense; life sentence may be imposed.

Any person who has been three times convicted of a felony under the laws of this State, and/or any other State, United States or any territory of the United States, and who shall thereafter be convicted of a subsequent felony of this State is hereby declared to be a habitual criminal, and the Court in which such fourth or subsequent conviction is had, in imposing sentence, may, in its discretion, impose a life sentence upon the person so convicted.[6]

Accordingly, in *Oney,* this Court recognized that habitual criminal status in Delaware was originally predicated solely upon the commission of any four felonies, without regard to the nature of either the three prior felonies or the fourth triggering felony.[7]

The Delaware habitual criminal statute[8] remained unchanged until 1970 when section 3911 was rewritten.[9] Old section 3911 was redesignated subsection (a) of new section 3911, but restated to provide as follows:

(a) Any person who has been three times convicted of a felony, *other than those which are specifically mentioned in subsection (b) hereunder,* under the laws of this State, and/or any other State, United States or any territory of the United States, and who shall there-

after be convicted of a subsequent felony of this State is declared to be a habitual criminal, and the Court in which such fourth or subsequent conviction is had, in imposing sentence, may, in its discretion, impose a life sentence upon the person so convicted.

The italicized words in subsection (a) represented new language not found in old section 3911. Subsection (b) was also added and provided in part:

(b) Any person who has been two times convicted of a felony hereinafter specifically named, ... and who shall thereafter be convicted of a subsequent felony, hereinafter specifically named, of this State is declared to be a habitual criminal ....

Subsection (b) was a completely new statutory enactment and made habitual criminal status applicable to a person two times convicted of specifically named felonies. The habitual offender statute remained basically the same for the next two decades.

### *Parole and Conditional Release Life Sentence Considered 45 Years*

■ In 1964, the General Assembly enacted section 4348 and section 4346.[10] Section 4348 entitled, **Release Upon Merit and Good Behavior Credits,** provides in pertinent part:

A person having served that person's term or terms in incarceration, less *merit and good behavior credits* as having been earned, shall, upon release, be *deemed as released on parole* until the expiration of the maximum term or term for which the person is sentenced.[11]

---

6. 49 Del.Laws, c. 413.

7. *Oney v. State,* 446 A.2d 389 (Del.1982).

8. Del.Code Ann. tit. 11, § 3911.

9. 57 Del.Laws, c. 585.

10. *Jackson v. Multi–Purpose Criminal Justice Facility,* 700 A.2d 1203 (Del.1997).

11. Del.Code Ann. tit. 11, § 4348.

Section 4346 is entitled **Eligibility for Parole.** Section 4346(a) provided that for purposes of parole eligibility, the term of a sentence was to be reduced by merit and good behavior credits. Subsection (a) provided:

> A person confined to any correctional facility administered by the Department may be released on parole by the Board if the person has served ⅓ of the term imposed by the court, such term to be reduced by such *merit and good behavior credits* as have been earned, or 120 days, whichever is greater. For the purpose this subchapter, "court" shall include any court committing an offender to the Department.

Section 4346(c) provided, in part:

> For *all* purposes of this section, a person sentenced to imprisonment for life shall be considered as having been sentenced to a fixed term of 45 years.

When the section 4346 parole statute and the section 4348 conditional release statute were both enacted in 1964 they were within the same chapter of the Delaware Code. Each statute permitted the reduction of an inmate's sentence through earned merit and good time credits.[12]

The General Assembly provided in 4346(c) that a life sentence was considered to be a fixed term of 45 years for purposes of reduction by merit and good behavior credits in determining parole eligibility under section 4346(a). The General Assembly further provided in section 4348 that conditional release upon the basis of earning merit and good behavior credits shall "be deemed as on parole." When those two 1964 statutory enactments are read *in pari materia*,[13] we hold that section 4348 incorporates section 4346(c)'s definition of a life sentence as a fixed term of 45 years. To the extent that *Jackson* is inconsistent with this opinion, it is overruled.[14]

### Parole Abolished Conditional Release Retained

Prior to 1990, an inmate could obtain early release in two ways: from the Parole Board under section 4346(a) or by conditional release pursuant to section 4348. Release of an inmate on parole under section 4346 is a matter of discretion for the Parole Board.[15] Conditional release under section 4348 is non-discretionary. If an inmate has accumulated sufficient good behavior and merit credits, he or she must be released from incarceration on his or her short-term release date, i.e., the maximum period of incarceration less accumulated good behavior and merit credits.[16] This Court has recognized that there is little practical difference between release on parole under section 4346 and conditional release under section 4348.[17]

The General Assembly has now prospectively abolished parole as a basis for early release. Pursuant to the Truth–in–Sentencing Act of 1989,[18] a sentence of Level V incarceration for any crime committed after June 29, 1990 is no longer subject to the parole provisions of section 4346.[19] Although the 1989 Truth–in–Sentencing Act

---

12. *See Richmond v. State,* 446 A.2d 1091, 1094 (Del.1982).

13. *State Farm Mut. Auto. Ins. Co. v. Wagamon,* 541 A.2d 557 (Del.1988).

14. *Jackson v. Multi–Purpose Criminal Justice Facility,* 700 A.2d 1203 (Del.1997).

15. Del.Code Ann. tit. 11, § 4347(c); *Jackson* at 1206, n. 11.

16. *Jackson* at 1206, n. 11.

17. *Richmond* at 1094, n. 9.

18. 67 Del.Laws, c. 130.

19. *See* Del.Code Ann. tit. 11, §§ 4205(j) and 4354.

*completely eliminated parole*, that statutory enactment continues to generally permit conditional release for good time credit. The Truth–in–Sentencing Act provides that:

All sentences imposed for any offenses *other than a life sentence imposed for class A felonies* may be reduced by earned good time under the provisions of this section and rules and regulations adopted by the Commissioner of Corrections.[20]

The enactment of section 4381(a) reflects the General Assembly's understanding, consistent with our holding in this opinion, that prior to the Truth–in–Sentencing Act, a *life sentence* for class A felonies was considered to be a term of *45 years* under section 4346(c) and subject to conditional release pursuant to section 4348. By eliminating parole completely and then eliminating good time credit that would lead to conditional release for class A felonies, the General Assembly intended that a life sentence for class A felonies would no longer be considered a term of 45 years but would, in fact, be a natural life sentence.

The General Assembly also created classifications for felonies when the Truth–in–Sentencing Act was adopted. It did not, however, reclassify section 4214(a) life sentences for habitual offenders as class A felonies. Accordingly, we must examine the amendments that were made to the habitual offender statute as part of the Truth–in–Sentencing Act to ascertain the General Assembly's current intent with regard to a section 4214(a) life sentence.

### Habitual Offender Dichotomy

We have already noted that in 1970, the General Assembly drew a distinction between a habitual offender designation un-

der section 4214(a) and habitual offender status pursuant to subsection (b). In 1970, a life sentence under (a) could receive the benefit of parole and was considered to be a fixed term of 45 years.[21] In 1970, a person serving a life sentence imposed under subsection (b) was not eligible for parole.

The General Assembly's intention to retain the distinction that was first made in 1970 between habitual offenders serving life sentences under section 4214(a) and 4214(b) remains clear. In the 1990 amendments to the habitual offender statute, as part of the Truth–In–Sentencing statutory remedial process, section 4214 was amended as follows:

a) Amend subsection (a) by deleting the words "may, in its discretion, impose a life sentence upon the person so convicted" and substituting in lieu thereof the following:

"may in its discretion, impose a sentence of up to life imprisonment upon the person so convicted. Notwithstanding any provision of this Title to the contrary, any sentence so imposed pursuant to this subsection shall not be subject to suspension by the Court, and shall be served in its entirety at a full custodial Level V institutional setting without benefit of probation or parole, except that any such sentence shall be subject to the provisions of Sections 4205(h), 4217, 4381, and 4382 of this Title."[22]

These statutory changes to subsection (a) reflect the unambiguous intent of the General Assembly. First, a sentence under subsection 4214(a) can now be *up to life*, not just life. Second, no sentence under subsection (a) is eligible for probation or parole. Third, as amended, *any* sentence in subsection (a)—including a life

---

20. Del.Code Ann. tit. 11, § 4381(a).

21. Del.Code Ann. tit. 11, § 4346(c).

22. 67 Del. Laws, c. 350, § 37 (Approved July 13, 1990).

sentence—is subject to reduction by earned good time credit pursuant to section 4381(a).

The General Assembly's intention of providing good time reduction could be accomplished for a life sentence imposed under section 4214(a) only by continuing to "consider it to be a fixed term of 45 years."[23] Therefore, section 4346(c) was not repealed or amended. Consequently, after passage of the Truth–in–Sentencing Act, persons sentenced to life as a habitual offender under section 4214(a) are not eligible for release on parole but such persons are still eligible for conditional release pursuant to section 4348, since subsection (a) specifically incorporates section 4381 by reference.

Conversely, the General Assembly's simultaneous amendment to section 4214(b) demonstrates its intention for a life sentence under subsection (b) to mean natural life. That amendment states:

> (b) Amend Subsection (b) by adding the following language at the end thereof: "Notwithstanding any provision of this Title to the contrary, any sentence imposed pursuant to this subsection shall not be subject to suspension by the Court, and shall be served in its entirety at a full custodial Level V institutional setting without benefit of probation, parole, *earned good time* or any other reduction."[24]

The overall intention of the General Assembly is set forth in the language that amended both sections 4214(a) and (b) of the habitual offender statute in 1990 and is manifest when viewed in two contexts. First, section 4381 is the section that provides for good time credit. A discretionary life sentence imposed under subsection (a) is not eligible for parole but remains subject to the earning of good time credit because the amended statute makes *any* subsection (a) sentence expressly subject to section 4381. Second, with the 1990 amendments, a mandatory life sentence imposed under subsection (b) is not eligible for parole and is also *not* subject to "earned good time or any other reduction." Consequently, in the context of promulgating the Truth–In–Sentencing Act, the General Assembly has retained the distinction between life sentences under section 4214(a) and (b) that was first legislated in 1970.

A life sentence under section 4214(a) of the habitual offender statute is now unique in comparison to the General Assembly's statutory scheme for other life sentences. It differs by express statutory language from any of the following types of life sentences:

- A life sentence for murder in the first degree is "life without benefit of probation or parole or any other reduction."[25]
- A life sentence for a class A felony is not subject to the statute authorizing the award of good time.[26]
- A life sentence for a three-time violent offender is not subject to the probation or parole of Title 11, Chapter 43, which, includes, § 4381.[27]

■ Accordingly, when the Truth–in–Sentencing Act was adopted, the General Assembly's intent to treat a life sentence under section 4214(a) differently, from other life sentences, by making it eligible for conditional release, is clearly reflected in all of its carefully crafted statutes and amendments. The General Assembly ac-

---

23. Del.Code Ann. tit. 11, § 4346(c).

24. 67 Del. Laws, c. 350, § 37 (emphasis supplied).

25. Del.Code Ann. tit. 11, § 4209(a).

26. Del.Code Ann. tit. 11, § 4381(a).

27. Del.Code Ann. tit. 11, § 4214(b).

complished that intention by not repealing section 4346(c) and continuing to consider a life sentence for a habitual offender under section 4214(a) to be a fixed term of 45 years under section 4346(c). Therefore, we hold that a person sentenced to life as a habitual offender pursuant to section 4214(a) is to be "considered as having been sentenced to a fixed term of 45 years"[28] and qualifies for conditional release pursuant to section 4348, based upon good time credits earned pursuant to section 4381.

### *Crosby's Sentencing Decision*

The Superior Court held that Crosby's life sentence as a habitual offender under section 4214(a) was equivalent to a fixed term of 45 years and that Crosby's eligibility for conditional release should be computed on that basis under section 4348 as he earned merit and good behavior credits under section 4381. We have concluded that the Superior Court's ruling is correct. Before we can properly decide Crosby's Eighth Amendment claim, however, we must review the basis for the Superior Court's decision to sentence Crosby to a life sentence that was equivalent to a fixed term of 45 years.

Under Delaware law, Forgery in the Second Degree is classified as a class G felony.[29] That is the lowest category of felony-level offenses in Delaware. Except as provided by the habitual criminal statute, class G felonies carry a maximum sentence of up to two years incarceration.[30]

Our first remand order directed the sentencing judge to consider Crosby's life sentence in light of the relevant case law interpreting the Eighth Amendment of the United States Constitution and to file a report identifying the documentary basis and reasoning behind the decision to impose a life sentence on Crosby. The sentencing judge submitted his report to this Court on January 30, 2003. That report identified and subdivided ten "salient points," as follows:

1. First and foremost, Crosby committed the forgery charge, for which he received the life sentence, about 26 months after having been previously declared a habitual offender.

2. The forgery charge was committed less than two years after his release from his 1999 burglary third degree/habitual offender sentence.

3. When he committed the forgery offense he was on probation. Though discharged as unimproved, he was on probation when he committed the burglary charge.

4. Crosby has numerous proceedings in this Court for violation of probation covering a span in excess of 12 years. Many violations of probation reports are in the Presentence report.

5. Those reports manifest a continuing pattern of disregard of the conditions of probation and orders of this Court and a complete lack of amenability to sanctions other than jail.

6. One essential pattern revealed in those reports is Crosby's years-longs refusal, despite many opportunities and orders, to engage in substance abuse treatment. For example:

 a. A 1988 violation report while serving probation for a sentence for burglary in the second degree; back on drugs, missed evaluation then when evaluated, treatment and was discharged.

 b. A 1991 emergency capias/warrant lists violations for failed drug tests, missing drug treatment, and drinking.

---

**28.** Del.Code Ann. tit. 11, § 4346(c).

**29.** Del.Code Ann. tit. 11, § 862(2).

**30.** Del.Code Ann. tit. 11, § 4205(b)(7).

c. A 1993 violation of probation report which states:

Mr. Chris A. Crosby has been under my supervision since November 20, 1992. Since that time, Mr. Crosby has missed numerous office visits despite warnings from this officer.

Mr. Crosby has a long history of Violation of Probation. His criminal history dates back to January 3, 1966. Mr. Crosby's convictions include Disorderly Conduct, Resisting Arrest, Criminal Trespass, Forgery, Assault, Theft, Driving Under the Influence, Falsely Reporting an Incident, Burglary, Escape, Unlawful Imprisonment, Offensive Touching, Possession of a Deadly Weapon by a Person Prohibited, Possession With the Intent to deliver Cocaine and four(4) previous Violation of Probations.

Mr. Crosby is a thirty-seven (37) year old who has no respect for the orders of the Court. Although he has remained arrest free while under supervision on your Honor's probation, Mr. Crosby's previous history indicates that trouble may be forthcoming.

d. A March 2000 violation report stating Crosby refuses to attend court-ordered treatment evaluation and "as a result of such refusal poses a substantial threat to the community or himself and Mr. Crosby has demonstrated willful failure to make court-ordered payments." This report was filed in connection with the sentence for burglary third degree imposed when Crosby was first declared a habitual offender.

7. The presentence report prepared in 1986 for Crosby's sentencing on the charge of burglary in the second degree states that he lived in California and Oklahoma. While in California, he was sentenced to three years probation for forging a government check. He also incurred several arrests and a one year sentence for DUI.

8. Prior to the forgery conviction for which he received a life sentence, Crosby had been convicted of five felonies. SENTAC classified two of them, burglary in the second degree and possession with intent to deliver, as violent felonies. Crosby's felony record spanned, as of the date of the current sentence, 16 years. Interspersed with those felony convictions is a persistent pervasive pattern of violation of the probationary portions of his sentences, including misdemeanors (unlawful imprisonment in the second degree and escape in the third degree).

9. In the nearly 14 years on this bench, Crosby is not the first repeat habitual offender I have sentenced. That repetition, regrettably, is not surprising in light of the information in the presentence report about the types of crimes he has committed, his repeated use of false or wrong names and birth dates, his non-credible explanations for his own behavior, and the repeated attempts over many years to get him into treatment without success. The most glaring example is his becoming a repeat habitual offender within such a short period of time. Of course, I took into account his extensive misdemeanor record. Crosby has had 5 sentencings for felony convictions preceded by presentence investigations. He had one sentencing for two misdemeanors (reduced charges) but without a presentence report in this Court. Comments from prior reports include:

1. The offender has been incarcerated since February. He was serving two Municipal Court sentences which expired on September 10, 1986.

The offender has been convicted for crimes committed in California and

Oklahoma as well as Delaware. He was also charged with theft in Arizona but the disposition of this charge is unknown. The offender's criminal record in Delaware dates back to 1966 when he was not quite eleven years old. The offender is extremely irresponsible and appears to be completely unconcerned for the property of others or the consequences of his actions.

The prognosis for future conduct is poor.

2. In October 1986, the offender was sentenced to two years of imprisonment to be followed by three years of probation on a burglary second degree charge. In July, 1987, he was sentenced to an additional 90 days of imprisonment for escape third degree to be followed by twenty-one months of probation. He was also sentenced to two years concurrent probation on a charge of unlawful imprisonment second degree. The offender was released from custody in April 1988 on conditional release. Within one month of his release, John Doherty, his probation/parole officer, became aware that the offender was again abusing narcotic drugs. He was involved in inpatient counseling at SO-DAT but soon missed so many appointments that he was discharged from the program for non-compliance with their rules. Additionally, the offender, as of May 19, 1989, had made no payments at all toward his financial obligation of over $2,200.00 owed for fines, costs, and restitution. Because of the offender's lack of motivation to correct his substance abuse problem, his failure to pay toward his financial obligations, and his acquisition of new charges, the prognosis is considered poor.

3. The evaluation contained in the prior presentence report which was prepared in June, 1989 still applies.

Crosby's years-long pattern of crimes and violations are but echoes and confirmations of these evaluations.

10. I am fully aware that 11 *Del. C.* § 4214(a) provides me with a significant discretion concerning the length of sentence. This sentence was not imposed in haste or lightly. I was also aware there was no direct victim, such as a store or a bank, but I also knew that this was an act against public administration.

### Eighth Amendment Analysis

The Eighth Amendment, which forbids cruel and unusual punishments, contains a "narrow proportionality principle" that "applies to noncapital sentences." [31] We have held that Crosby's life sentence as a habitual offender under section 4214(a) is considered to be a fixed term of 45 years. The United States Supreme Court addressed the proportionality principle as applied to terms of years in a series of cases beginning with *Rummel v. Estelle.* [32]

In *Rummel,* the United States Supreme Court held that it did not violate the Eighth Amendment for a State to sentence a three-time offender to life in prison with the possibility of parole. [33] Like Crosby, Rummel was sentenced to a lengthy prison

---

**31.** *Harmelin v. Michigan,* 501 U.S. 957, 996–97, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in judgment); *cf. Weems v. United States,* 217 U.S. 349, 371, 30 S.Ct. 544, 54 L.Ed. 793 (1910); *Robinson v. California,* 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (applying the Eighth Amendment to the States via the Fourteenth Amendment).

**32.** *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

**33.** *Id.* at 284–85, 100 S.Ct. 1133.

term under a recidivism statute. Rummel's two prior offenses were a 1964 felony for "fraudulent use of a credit card to obtain $80 worth of goods or services," and a 1969 felony conviction for "passing a forged check in the amount of $28.36."[34]

Rummel's triggering offense was a conviction for felony theft—"obtaining $120.75 by false pretenses."[35] In *Rummel*, the United States Supreme Court ruled that "[h]aving twice imprisoned him for felonies, Texas was entitled to place upon Rummel the onus of one who is simply prescribed by the criminal law of the State."[36] The Texas recidivism statute was described as "nothing more than a societal decision that when such a person commits yet another felony, he should be subjected to the admittedly serious penalty of incarceration for life, subject only to the State's judgment as to whether to grant him parole."[37]

Three years after *Rummel*, in *Solem v. Helm*,[38] the United States Supreme Court held that the Eighth Amendment prohibited "a life sentence without possibility of parole for a seventh nonviolent felony." The triggering offense in *Solem* was "uttering a 'no account' check for $100."[39] The United States Supreme Court held that the Eighth Amendment's ban on cruel and unusual punishments "prohibits ... sentences that are disproportionate to the crime committed."[40] In *Solem*, the Court identified that three factors may be relevant to a determination of whether a sentence is so disproportionate that it violates the Eighth Amendment: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions."[41]

Eight years after *Solem*, the issue of proportionality was presented again to the United States Supreme Court in *Harmelin*. The factual context presented in *Harmelin* was a first-time offender convicted of possessing 672 grams of cocaine. He was sentenced to life in prison without possibility of parole. A majority of the United States Supreme Court rejected Harmelin's claim that his sentence was so grossly disproportionate that it violated the Eighth Amendment.

Justice Kennedy's concurring opinion in *Harmelin*, which was joined by Justice O'Connor and Justice Souter, set forth a revised proportionality test. In his concurrence, Justice Kennedy found four common principles in the United States Supreme Court's prior Eighth Amendment cases which "give content to the uses and limits of proportionality review."[42] The first principle acknowledges that the fixing of penalties and prison sentences for specific crimes "involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not courts."[43] The second principle recognizes that the Eighth Amendment does not mandate the adoption of any particular penological philosophy.[44] The third principle is an understanding that "marked

---

34. *Id.* at 265, 100 S.Ct. 1133.

35. *Id.* at 266, 100 S.Ct. 1133.

36. *Id.* at 284, 100 S.Ct. 1133.

37. *Id.* at 278, 100 S.Ct. 1133.

38. *Solem v. Helm*, 463 U.S. 277, 279, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

39. *Id.* at 281, 103 S.Ct. 3001.

40. *Id.* at 284, 286, 103 S.Ct. 3001.

41. *Id.* at 292, 103 S.Ct. 3001.

42. *Harmelin* at 998, n. 28, 111 S.Ct. 2680 (Justice Kennedy concurring in part and concurring in judgment).

43. *Id.* (*quoting Rummel* at 275–76 (1980), n. 29, 100 S.Ct. 1133).

44. *Id.* at 999, n. 28, 111 S.Ct. 2680.

divergences both in underlying theories of sentences and in the length of prescribed prison terms are the inevitable, often beneficial, result of the federal structure." [45] Finally, the fourth principle is a belief that, to the maximum extent possible, proportionality review should be guided by "objective factors," including the framework established in *Solem*.[46]

In the view of the concurring Justices, consideration of these four common principles inform the final principle, the one that "gives content to the uses and limits of proportionality review," that being: "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime." [47] Justice Kennedy's concurrence also stated that *Solem* "did not mandate" comparative analysis "within and between jurisdictions." [48] In the opinion of the concurring Justices, the proper purpose of a comparative analysis of sentences imposed for other crimes, both intra and inter jurisdictionally, is to either validate or dispel the initial inference of gross disproportionality.[49]

The "rule of *Harmelin*" therefore, restricts proportionality review to the "rare case in which a *threshold comparison* of the crime committed and the sentence imposed leads to an *inference of gross disproportionality*." [50] A few months ago, the United States Supreme Court in *Ewing* used the proportionality principles from Justice Kennedy's concurrence in *Harmelin* to guide its application of the Eighth Amendment in the context of Cali-

fornia's three strikes law.[51] Ewing argued that his three strikes sentence of 25 years to life was unconstitutionally disproportionate to his offense of "shoplifting three golf clubs."

In a plurality opinion written by Justice O'Connor, joined by Chief Justice Rehnquist and Justice Kennedy, the United States Supreme Court concluded that Ewing's sentence of 25 years to life in prison, imposed for the offense of felony grand theft under the three strikes law, is not grossly disproportionate. Therefore, Ewing's sentence did not violate the Eighth Amendment's prohibition on cruel and unusual punishments. The United States Supreme Court's analysis in *Ewing* leads us to a different conclusion, however, in Crosby's case.

In weighing the gravity of Ewing's offense, the United States Supreme Court began with a determination that it must place on the scales of justice not only Ewing's current felony, but also Ewing's long history of recidivism. Any other approach would fail to accord proper deference to the policy judgments that find expression in the legislature's choice of sanctions. In imposing a three strikes sentence, the United States Supreme Court recognized that California's interest in not merely punishing the offense of conviction, or the "triggering" offense: "[I]t is in addition the interest...in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law.[52] To give full effect to Cali-

45. *Id.*

46. *Id.* at 1000, 111 S.Ct. 2680.

47. *Id.* at 1001, 111 S.Ct. 2680.

48. *Id.* at 1005, 111 S.Ct. 2680.

49. *Id.*

50. *Id.* at 1005, 111 S.Ct. 2680 (emphasis supplied).

51. *Ewing* at ——, 123 S.Ct. at 1179, n. 1.

52. See *Rummel* at 276, n. 29, 100 S.Ct. 1133; *Ewing* at ——, 123 S.Ct. at 1190; *Solem* at 296, 103 S.Ct. 3001 ("a State is justified in

fornia's choice of this legitimate penological goal, the proportionality review of Ewing's sentence had to take that goal into account.

■ The same considerations are extant in our review of Delaware's habitual offender statute. Delaware has a legitimate public-safety interest in incapacitating and deterring habitual offenders.[53] Nevertheless, we have concluded that Crosby's sentence for the most recent forgery, when viewed in the context of his prior criminal history, is "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."[54]

### Crosby's Sentence

■ Delaware's habitual offender statute authorizes trial courts to sentence any person who "has been 3 times convicted of a felony," and who is subsequently convicted of a 4th felony, to "up to life imprisonment"[55] without the possibility of parole.[56] If the 4th felony is a title 11 violent felony, as defined in section 4201(c), as a minimum, the court must sentence the habitual offender to the maximum term provided by statute for that felony. If the 4th felony is not a title 11 violent felony, however, there is no minimum sentence. Because this section of the statute does not differentiate among non-violent felonies, a person could be sentenced to as much as 45 years incarceration, instead of the normal maximum of 2 years, for committing a class G felony such as: theft of a pig;[57]

forgery of a "public transportation transfer[ ]" or a doctor's prescription;[58] or copying for sale or profit through public performance any copyrighted sound recording.[59] Such broad sentencing discretion is consistent with the General Assembly's intent to penalize repeat offenders. But even repeat offenders are entitled to sentences that are not grossly disproportionate to their crimes.

■ The trial court, in the first instance, appeared to be sentencing Crosby out of frustration. The State recommended a sentence "close to the 10 year range," but the court sentenced Crosby to life. Its only comments at sentencing were that Crosby's presentence file was more than one inch thick and that he was a "one-man crime wave." After remand, the trial court provided a more detailed account of its thinking, but in doing so only confirmed that the judicial system "gave up" on Crosby. The trial court adopted the presentence report's conclusion:

> After 28 years of criminal justice system involvement, five PSI's and two declarations of habitual offender status, it is safe to say that the offender has exhausted all of his options regarding rehabilitation. *He's not going to change. We can keep on seeing him in court, ... and declaring him a habitual offender every time he gets arrested, but he will still be the same hopeless criminal. It's time to lock him away for the rest of his life and move on to a new offender.* (Emphasis added.)

---

punishing a recidivist more severely than it punishes a first offender.").

**53.** *See Ewing* at ——, 123 S.Ct. at 1187.

**54.** *Harmelin* at 1005, 111 S.Ct. 2680 (Kennedy, J., concurring in part and concurring in judgment).

**55.** Del.Code Ann. tit. 11, § 4214(a).

**56.** *Id.* As explained earlier, the phrase "life imprisonment," as used here, refers to a sentence of 45 years. Moreover, although parole is prohibited, sentence reduction through good time credits is permitted.

**57.** Del.Code Ann. tit. 11, § 859(a).

**58.** Del.Code Ann. tit. 11, § 861(b)(2).

**59.** Del.Code Ann. tit. 11, § 920.

This mind-set, even with a less severe sentence, would be troubling. Defendants should not face excessive sentences merely because they are too much trouble for the criminal justice system. To be sure, defendants should face harsher sentences for repeated criminal activity, but our judicial system should not allow frustration or failed efforts at rehabilitation to result in a lock-him-up-and-throw-away-the-key approach to sentencing. Here, a "life" sentence of 45 years is excessive.

### Crosby's Case in the Eighth Amendment Spectrum

■ The Eighth Amendment of the United States Constitution limits the sentencing discretion under Delaware's habitual offender statute by prohibiting sentences that are "greatly disproportion[ate]" to the conduct being punished.[60] To determine whether a particular sentence is prohibited, this Court must undertake "a threshold comparison of the crime committed and the sentence imposed."[61] If such a comparison "leads to an inference of gross disproportionality,"[62] then this Court must compare Crosby's sentence with other similar cases to determine whether the trial court acted out of step with sentencing norms.[63]

■ Three factors are helpful in comparing this case to other habitual offender cases: "(a) the length of the prison term in real time, i.e., the time that the offender is likely actually to spend in prison; (b) the sentence-triggering criminal conduct, i.e., the offender's actual behavior or other offense-related circumstances; and (c) the offender's criminal history."[64] As to time in prison, if Crosby earns the maximum amount of good time credits available, his effective sentence will be reduced to slightly over 36 years.[65] Thus, in the best-case scenario, Crosby will be eligible to be released from prison when he is 82 years old.[66] The triggering crime was Forgery in the Second Degree, which is a nonviolent, class G felony. Finally, Crosby's criminal history includes numerous misdemeanors and five prior felony convictions spanning a fifteen-year period: (1) Burglary in the Third Degree; (2) Forgery in the Second Degree; (3) Possession of a Deadly Weapon by a Person Prohibited; (4) Possession with the Intent to Deliver; and (5) Burglary in the Second Degree. There are seven classes of felony (A—G), and all of Crosby's prior offenses were in the lowest five classes—one class C felony,[67] two

**60.** *Harmelin* at 997, 111 S.Ct. 2680 (Justice Kennedy concurring in part and concurring in judgment) (internal quotation marks omitted); *see also Ewing* at ——, 123 S.Ct. at 1187.

**61.** *Harmelin* at 1005, 111 S.Ct. 2680 (Justice Kennedy concurring in part and concurring in judgment).

**62.** *Id.*

**63.** *See Id.* ("The proper role for comparative analysis of sentences... is to validate an initial judgment that a sentence is grossly disproportionate to a crime.").

**64.** *Ewing* at ——, 123 S.Ct. at 1194 (Justice Breyer dissenting).

**65.** This term was calculated as follows: A 45 year sentence = 16,425 days. After 36 years,

assuming maximal good time, Crosby will be credited with having served (36)(365) days + (90)(36) days = 16,380 days. *C.f.* Del.Code Ann. tit. 11, § 4381(e) ("No more than a total of 90 days of 'good time' may be earned in any 1 year consisting of 365 days actually served.").

**66.** Crosby's Criminal History Rapsheet lists two dates of birth, March 25, 1949, and April 5, 1955. Chris Crosby Criminal History Rapsheet at 1 (November 28, 2001). For the purposes of this opinion, the later one is used. In addition, the effective date of Crosby's sentence is June 1, 2001. Superior Court Investigative Services Report, Chris A. Crosby.

**67.** Burglary in the Second Degree can be either a class D or a class C felony. Del.Code Ann. tit. 11, § 825. In Crosby's case, it was a

class E felonies,[68] one class F felony,[69] and one class G felony.[70]

While there can never be a perfect comparison of defendants' crimes and criminal histories, the relevant data on Crosby provides objective evidence that his sentence is more extreme than those that have been upheld by the United States Supreme Court on direct appeal.

### Solem v. Helm

The case most similar to Crosby's is *Solem v. Helm*.[71] In *Solem*, the Supreme Court vacated a sentence of life imprisonment without the possibility of parole for the crime of writing a false check in the amount of $100.[72] Helm's offense, the Court noted, was "one of the most passive felonies a person could commit. It involved neither violence nor threat of violence to any person."[73] Crosby's crime must be considered even less serious, as it was both non-violent and readily detectable.[74] Crosby's case is also similar to Helm's on the issue of criminal histories. Prior to his ultimate crime, Helm had been convicted of "six nonviolent felonies";[75] three convictions of third degree burglary; one conviction of obtaining money under

false pretenses; one conviction of grand larceny; and one conviction of third-offense driving while intoxicated.[76]

### Rummel v. Estelle

In *Rummel v. Estelle*,[77] the Supreme Court upheld a sentence of life imprisonment with eligibility for parole for the crime of "obtaining $120.75 by false pretenses," where the defendant's only prior crimes were "passing a forged check in the amount of $28.36," and "fraudulent use of a credit card to obtain $80 worth of goods or services."[78] *Rummel* is often cited for the proposition that a "lengthy" prison term, like Crosby's, is constitutionally permissible under a recidivism statute. Closer examination, however, reveals little similarity between the sentences imposed on Rummel and Crosby. The *Rummel* Court noted that Texas, where Rummel was sentenced, "ha[d] a relatively liberal policy of granting 'good time' credits to its prisoners, a policy that historically has allowed a prisoner serving a life sentence to become eligible for parole in as little as 12 years."[79] Although the Supreme Court recognized that Rummel had no right to be released in 12 years, it "could hardly ig-

---

class C. *Crosby v. State*, Cr.I.D. No. 30501860DI (Del.Super. August 5, 1986).

**68.** Although both Possession with Intent to Deliver and Possession of a Deadly Weapon by a Person Prohibited can have offense levels other than class E, Del.Code Ann. tit. 11, § 4751, Del.Code Ann. tit. 11, § 1448, Crosby's convictions were both of the class E variety. Criminal History Rapsheet: Chris Crosby at 7 (August 8, 2001).

**69.** Burglary in the Third Degree is a class F felony. Del.Code Ann. tit. 11, § 824.

**70.** Forgery in the Second Degree is a class G felony. Del.Code Ann. tit. 11, § 861(b)(2).

**71.** 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

**72.** *Id.* at 281, 103 S.Ct. 3001.

**73.** *Id.* at 296, 103 S.Ct. 3001 (internal citation and quotation marks omitted).

**74.** Chris Crosby used his brother's name, John Crosby, in signing an official document upon his arrest. So, his triggering crime was not only non-violent and easily detectable, but also it involved no attempted pecuniary gain, unlike Helm's triggering offense.

**75.** *Solem* at 279, 103 S.Ct. 3001.

**76.** *Solem* at 279–80, 103 S.Ct. 3001.

**77.** 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

**78.** *Id.* at 265–67, 100 S.Ct. 1133.

**79.** *Id.* at 280–81, 100 S.Ct. 1133.

nore" that reality.[80] Indeed, the fact that Rummel could be released after only 12 years was considered pivotal by every federal court that heard his case.[81]

If the trial judge had chosen to accept the State's recommendation and impose a sentence "close to the ten year range," then this case would be controlled by *Rummel*, and there would be no valid constitutional claim. The probable effective sentence in *Rummel*, however, was dramatically shorter than the minimum sentence Crosby faces. Nothing in *Rummel* is inconsistent with a finding that Crosby's sentence—probably three times greater than Rummel's—is unconstitutional.

### Ewing v. California

In *Ewing v. California*,[82] the United States Supreme Court's most recent Eighth Amendment decision,[83] the Court upheld a sentence of 25 years to life for the crime of stealing three golf clubs collectively valued at approximately $1,200.[84] Comparing Ewing's case to Crosby's reveals that Crosby's treatment was harsher, and his sentence less justified, measured by all three of the spectrum-defining criteria identified by Justice Breyer in his *Ewing* dissent.[85]

First, Ewing's sentence of 25 years to life imposes far less probable prison time than Crosby's effective sentence of 36 to 45 years. In Eighth Amendment analyses, the Supreme Court assigns great significance to the minimum time a defendant could serve.[86] On this measure, Ewing's sentence was 11 years shorter than Crosby's. To the extent that maximum sentences need be examined, Crosby's actual sentence is "life" in prison and, since Crosby will be at least 91 years of age at the end of his 45 year prison term, or at least 82 at the end of his minimum term of 36 years, it is likely that his maximum sentence is a life term in the literal sense.

80. *Id.*

81. *See Solem* at 297, 103 S.Ct. 3001 (discussing *Rummel*, and noting that the sentence of life imprisonment without the possibility of parole "is far more severe than the life sentence we considered in *Rummel v. Estelle*. Rummel was likely to have been eligible for parole within 12 years of his initial confinement, a fact on which the Court relied heavily."); *Rummel* at 267, 100 S.Ct. 1133 (noting that the federal district court initially considering Rummel's claim "credit[ed] an argument by respondent that Rummel's sentence could not be viewed as life imprisonment because he would be eligible for parole in approximately 12 years."); *Id.* at 268, 100 S.Ct. 1133 (noting that "[o]f particular importance to the majority of the [Federal] Court of Appeals [which considered Rummel's case] en banc was the probability that Rummel would be eligible for parole within 12 years of his initial confinement.").

82. —— U.S. ——, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003).

83. *Lockyer*, n. 1, also raises Eighth Amendment issues. That case is less useful, however, because the Supreme Court did not review the sentence *de novo*. Instead, the Supreme Court applied the *habeas corpus* standard of review and decided only whether the California Court of Appeals' decision to uphold Andrade's sentence was "contrary to, or an unreasonable application of, clearly established federal law...." *Lockyer* at ——, n. 1, 123 S.Ct. at 1169, n. 1.

84. *Ewing* at ——–——, 123 S.Ct. at 1189—90.

85. *Ewing* at ——, 123 S.Ct. at 1194 (Justice Breyer dissenting).

86. *See, e.g., Ewing* at ——, 123 S.Ct. at 1186 (noting that the fact that the sentence in *Solem* had foreclosed the possibility of parole, while the sentence in *Rummel* had not, was a significant feature distinguishing the two cases); *Solem* at 300, 103 S.Ct. 3001 (the fact that Rummel would be eligible for parole, while Solem's sentence could be reduced only through executive clemency, represented a "fundamental[] differen[ce]" between the methods of sentence reduction in the two cases).

Second, Ewing's ultimate crime was significantly more serious than Crosby's. The *Ewing* Court specifically noted that, unlike in *Solem*, "Ewing's theft should not be taken lightly. His crime was certainly not one of the most passive felonies a person could commit." [87] Crosby's crime, on the other hand, was entirely passive. Finally, Ewing's prior criminal history was more serious than Crosby's. Ewing's record showed four prior "serious or violent felon[ies]": [88] one "first degree robbery and three separate residential burglaries." [89] In addition, near the start of Ewing's criminal career, he had been convicted of "felony grand theft auto," a crime which, after Ewing completed his sentence, "the sentencing court reduced...to a misdemeanor, permit[ting] Ewing to withdraw his guilty plea, and dismiss[ing] the case." [90]

Thus, both Ewing and Crosby had been convicted of five prior felonies, and Ewing's were far more serious. Based upon descriptions of Ewing's prior criminal conduct, it appears that, if his crimes had been committed in Delaware, Ewing would have acquired a record of no less than one class B felony, [91] three class D felonies, [92] and one class G felony. [93] Crosby, on the other hand, had been convicted of only one class C felony, two class E felonies, a class F felony, and a class G felony.

### Comparative Analysis

Based on the foregoing, we find that Crosby's case survives Justice Kennedy's threshold analysis under *Harmelin*. [94]

---

87. *Ewing* at ——, 123 S.Ct. at 1189 (internal quotation marks omitted).

88. *People v. Ewing*, 2001 WL 1840666, **1 (Cal.Ct.App.2001), *cert. granted*, 535 U.S. 969, 122 S.Ct. 1435, 152 L.Ed.2d 379, (2002), *aff'd*, —— U.S. ——, 123 S.Ct. 1179, 155 L.Ed.2d 108 (unpublished decision)(hereinafter *"Ewing 1"*); *see also Ewing* at ——, 123 S.Ct. at 1184 (reciting Ewing's criminal history).

89. *Ewing 1*, at **1, n. 84.

90. *Ewing* at ——, 123 S.Ct. at 1184.

91. The United States Supreme Court described Ewing's robbery: "Ewing accosted a victim in the mailroom of the apartment complex. Ewing claimed to have a gun and ordered the victim to hand over his wallet. When the victim resisted, Ewing produced a knife and forced the victim back to the apartment itself. While Ewing rifled through the bedroom, the victim fled the apartment screaming for help. Ewing absconded with the victim's money and credit cards." *Ewing* at ——, n. 1, 123 S.Ct. at 1184, n. 1. Under Delaware law, this would constitute Robbery in the First Degree, a class B felony. Del. Code Ann. tit. 11, § 832.

92. Ewing's three burglary convictions all occurred in an "apartment complex," *Ewing* at ——, n. 1, 123 S.Ct. at 1184, n. 1, and were characterized as "residential burglaries."

*Ewing 1* at **1, n. 84. The United States Supreme Court stated that during one burglary "[Ewing] awakened one of his victims, asleep on her living room sofa, as he tried to disconnect her video cassette recorder from the television in that room. When she screamed, Ewing ran out the front door." *Ewing* at ——, 123 S.Ct. at 1184. This indicates that Ewing's burglaries involved intrusion upon dwellings which, under Delaware law, would be Burglary in the Second Degree, a class D felony. Del.Code Ann. tit. 11, § 825.

93. Ewing's conviction for "felony grand theft auto," *Ewing* at ——, n. 1, 123 S.Ct. at 1184, n. 1, is difficult to categorize because it has not been further described in any available court opinion. But, at a minimum, it must constitute Theft of Property Valued at Over $1,000, which is a class G felony under Delaware law. Del.Code Ann. tit. 11, § 841.

94. *See Harmelin* at 1005, 111 S.Ct. 2680 (Justice Kennedy concurring in part and concurring in judgment); *Ewing* at ——, 123 S.Ct. at 1187 (quoting and adopting the framework Justice Kennedy advocated in *Harmelin*); *c.f. Ewing* at —— ——, 123 S.Ct. at 1196–97 (Justice Breyer dissenting) ("A threshold test must permit **arguably** unconstitutional sentences, not only **actually** unconstitutional sentences, to pass the threshold—at least where the arguments for unconstitutionality are un-

Once a case passes that threshold determination that its sentence "leads to an inference of gross disproportionality," this Court should undertake "intrajurisdictional and interjurisdictional analyses" to compare the sentence in question to other sentences imposed for similar crimes.[95] In this case, even a limited intrajurisdictional analysis is sufficient to demonstrate that Crosby's sentence is resoundingly harsher than other sentences recently imposed in Delaware under similar circumstances. Attached is an appendix of cases from 2002 in which defendants were sentenced under Delaware's habitual offender statute.[96] Under any fair reading, the appendix conclusively demonstrates that Crosby's sentence was radically harsher than the norm. Looking first at the 11 defendants whose ultimate crime was a class G felony, the sentences ranged from 10 years to 30 days in prison,[97] with the distribution heavily skewed towards the lower sentences. Only one defendant was sentenced to a term greater than 2½ years,[98] while six defendants received one year or less.[99] Second, the three defendants who, like Crosby, committed forgery in the second degree as their sole sentence-triggering conduct, were sentenced to terms of 1 year, 45 days, and 30 days.[100]

### Crosby Sentence Violates Eighth Amendment

 Following the principles announced by the Supreme Court, Crosby's sentence is so disproportionate that it must be set aside. Forgery in the Second Degree, the crime that subjected Crosby to this 45 year sentence, is the least serious type of felony and, in this case, it caused no harm to anyone but Crosby. His prior history, although hardly commendable, does not include the kind of repeated, violent crimes common to many habitual offenders. Finally, Crosby's sentence far exceeds any habitual offender sentence imposed in Delaware in the past year. Based on these factors, we conclude that the United States Supreme Court would find Crosby's sentence to be cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

 It might be helpful to place this holding in context. Under settled Delaware law, this Court generally will not review a sentence that is within the limits set by the legislature. "[T]his Court will not find error unless it is clear that the sentencing judge relied on impermissible factors or exhibited a closed mind."[101] We defer initially to the General Assembly's determination that a particular crime war-

usually strong ones. A threshold test that blocked every ultimately invalid constitutional claim—even strong ones—would not be a **threshold** test but a **determinative** test. And, it would be a **determinative** test that failed to take account of highly pertinent sentencing information, namely, comparison with other sentences...." (emphasis in the original)).

95. *Harmelin* at 1005, 111 S.Ct. 2680 (Justice Kennedy concurring in part and concurring in judgment).

96. These cases were taken from a document presented to this Court believed to provide records for all defendants sentenced under the habitual offender statute in 2002. Of the

28 defendants listed in this document, two— Paul C. Woodward, DOB September 2, 1954, and Carla Hampton, DOB January 14, 1971— have been omitted because the documents provided do not clearly establish that they were, in fact, sentenced as habitual offenders.

97. *See* Appendix Table 1, Nos. 1, 11.

98. Appendix Table 1, No. 1.

99. Appendix Table 1, Nos. 6, 7, 8, 9, 10, 11.

100. Appendix Table 1, Nos. 7, 10, 11.

101. *Fink v. State*, 817 A.2d 781, 790 (Del. 2003).

rants incarceration for a stated range of years; and then to the trial judge's determination that a sentence within that range is appropriate under all of the circum-stances.

A habitual offender statute, however, cannot directly link all possible crime(s) with the range of permitted sentences. The General Assembly attempted to resolve this problem by identifying those crimes and patterns of criminal behavior that must be treated most severely. First, subsection (b) requires the imposition of a mandatory life sentence on those convicted for the third time of the enumerated violent felonies and drug crimes.[102] Second, subsection (a) requires the imposition of a mandatory minimum term on those convicted for the fourth time where the triggering crime is a title 11 *violent* felony as defined in section 4201(c). Third, as in this case, where the triggering crime is a non-violent felony, subsection (a) permits the trial judge to sentence the defendant to any term of incarceration.

It is this third category, where the range of sentence is unlimited, that the potential for a grossly disproportionate sentence arises. Crosby presents the rare case where: (i) a defendant was convicted on a single count of the least serious, **non-violent** felony, (ii) but was sentenced to life—computed as a term of 45 years—the maximum term allowed under subsection (a), (iii) even though the State requested a significantly shorter term of incarceration—10 years—and Crosby's prior crimi-

nal record did not involve repeated violent crimes. This combination of factors, to our knowledge, is unprecedented. We do not expect this decision to spawn many successful challenges to other habitual offender sentences because the Eighth Amendment's "grossly disproportional" standard is so exacting.

### Conclusion

Accordingly, we hold that Crosby's life sentence pursuant to section 4214(a) is considered to be a fixed term of 45 years[103] that is subject to reduction[104] and conditional release[105] for good time credit. We also hold that Crosby's sentence violates the Eighth Amendment's ban on cruel and unusual punishments.[106] Therefore, the judgment of the Superior Court is reversed. This matter is remanded to the Superior Court for further proceedings in accordance with this opinion before a different judge.

The trial judge's two decisions after remand demonstrate his strong conviction that the sentence he imposed was fair. We have no doubt that, notwithstanding those strongly held views, the same judge could reconsider this matter impartially. But we think it better policy, whenever possible, to remand for resentencing before a different judge in cases like this one.[107] Assuring defendants, such as Crosby, that "the final [sentencing] decision is unrelated to any prior decision,"[108]

102. The enumerated violent felonies include murder, kidnapping, carjacking, rape, arson and other similar offenses.

103. Del.Code Ann. tit. 11, § 4346(c).

104. Del.Code Ann. tit. 11, § 4381(a)

105. Del.Code Ann. tit 11, § 4348.

106. *Ewing v. California,* — U.S. —, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003).

107. We find this case particularly appropriate for reassignment since Crosby was sentenced after entering a guilty plea. Thus, the trial judge did not gain any unique perspective about Crosby during the course of a trial.

108. *Wright v. Smith,* 1988 WL 32036 at **2 (Del.Supr.).

enhances public confidence in our judicial system.

The Clerk of this Court is also directed to transmit a copy of this opinion to the Attorney General, Public Defender and Department of Correction so that any inmate serving a life sentence that is affected by this opinion can have it calculated on the basis of a fixed term of 45 years with appropriate good time credit.

## APPENDIX

Table 1.

| | Defendant | Final Crime | Sentence | Prior Crimes/ Felony Class |
|---|---|---|---|---|
| 1 | Daniel Griffith [1] | Second Degree Conspiracy | 10 years | First Degree Robbery/ B [2] |
| 2 | Michael Dolan [3] | Theft > $1,000 | 2 years [4] | Second Degree Forgery (3 times)/ G |
| | | | | Third Degree Burglary/ D |
| | | | | Felony Theft/ UL [5] |
| 3 | Terence Jones [6] | Failure to Reregister as a Sex Offender | 6 months | Third Degree Burglary/ D |
| | | Theft > $1,000 | 2 years [7] | Unlawful Intercourse/ UL |
| | | | | Attempted Unlawful Sexual Intercourse/ A |
| | | | | Theft > $1,000/ G |
| | | | | Second Degree Burglary/ D |
| | | | | Second Degree Escape (twice)/ G |
| 4 | Thomas Wright [8] | Receiving Stolen Property > $1,000 | 2 years | Carrying a Concealed Deadly Weapon/ E |
| | | | | Theft/ G |
| | | | | Delivery of a Narcotic Schedule II/ C |
| | | | | Escape/ D |
| | | | | Second Degree Forgery/ G |
| 5 | Tyrone Redden [9] | Receiving Stolen Property > $1,000 | 2 years | Possession with Intent to Deliver (twice)/ E |
| | | | | Second Degree Conspiracy/ G |
| | | | | Theft/ G |
| | | | | Unlawful Use of Property/ G |
| | | | | Felony Receiving Stolen Property/ UL |
| 6 | Lefton Harmon [10] | Second Degree Conspiracy | 1 year | Deliver of a Schedule I Narcotic/ E |
| | | | | Unlawful Delivery of a Narcotic/ E |
| | | | | Receiving Stolen Property/ G |
| | | | | Maintaining a Vehicle for Narcotic Purposes/ F |
| | | | | Felony Possession with Intent to Deliver/ UL |
| 7 | Teres Brown [11] | Second Degree Forgery | 1 year | Shoplifting (twice)/ G |

| | | | | Second Degree Conspiracy/ G |
|---|---|---|---|---|
| | | | | Possession with Intent to Deliver Cocaine/ C |
| | | | | Second Degree Escape/ G |
| | | | | Second Degree Robbery/ D |
| 8 | Hakim Crawford [12] | Second Degree Escape | 9 months | Assault/ C |
| | | | | Possession with Intent to Deliver (twice)/ E |
| 9 | Kenneth Jefferson [13] | Second Degree Escape | 6 months | Second Degree Burglary/ D |
| | | | | Second Degree Burglary/ C |
| | | | | Second Degree Forgery (three times)/ G |
| | | | | Theft/ UL |
| 10 | Harold Harris [14] | Second Degree Forgery | 45 days | First Degree Reckless Endangerment/ E |
| | | | | Trafficking in Phencyclidine/ B |
| | | | | Maintaining a Dwelling for Unlawful Purposes/ F |
| 11 | Jerome Jackson [15] | Second Degree Forgery | 30 days | Second Degree Robbery/ D |
| | | | | Aggravated Menacing/ E |
| | | | | Second Degree Escape/ G |

1. *Griffith v. State*, Cs. No. 0012015221 (Del.Super. March 1, 2002).
2. After diligent efforts, it has been impossible to determine Griffith's entire prior record. The only prior offense listed on the JIC computerized database is robbery in the first degree. However, it is impossible that this is his only prior felony because, standing alone, it would not qualify him for sentencing as a habitual offender.
3. *Dolan v. State*, Cs. No. 0107016904 (Del.Super. January 25, 2002) (unpublished decision).
4. Followed by 6 months at level 2.
5. In this table, "UL" denotes, "felony class unlisted in the JIC computerized database."
6. *Jones v. State*, Cs. No. 0202012736 (Del.Super. June 18, 2002) (unpublished decision). In determining Jones's prior offenses, it became apparent that the court system computer database (JIC) contains a typographical error. In some cases, it lists Jones's birth date as March 02, 1968, while in other it is March 20, 1968. I will assume these to refer to the same person. In addition, some entries spell his first name, "Terrence."
7. Sentenced to "2 year[s] at supervision level 5 KEY" treatment. Upon "successful completion" of KEY, balance of sentence suspended to 9 months at level 4 treatment, following which the remainder of the sentence is suspended.
8. *Wright v. State*, Cs. Nos. 0105020916–9, 0112010620–7, 9612013895–30 (Del.Super. March 21, 2002) (unpublished decision).
9. *Redden v. State*, Cr.A. No. IN02011142 (Del.Super. May 8, 2002) (unpublished decision).
10. *Harmon v. State*, Cs. Nos. 0110011415–13, 0111018628–12 (Del.Super. March 19, 2002) (unpublished decision).
11. *Brown v. State*, Cr.A.No. IN02050380 (Del.Super. May 30, 2002) (unpublished decision).
12. *Crawford v. State*, Cs. No. 0208017856 (Del.Super. October 16, 2002) (unpublished decision).
13. *Jefferson v. State*, Cs. No. 9903010580 (Del.Super. January 9, 2002) (unpublished decision).
14. *Harris v. State*, Cs. No. 0112002382 (Del.Super. September 23, 2002) (unpublished decision).
15. *Jackson v. State*, Cs. No. 0108019445 (Del.Super. June 7, 2002) (unpublished decision).

Table 2.

| | Defendant | Final Offense(s) | Sentence [1] |
|---|---|---|---|
| 1 | Brady Couch [2] | First Degree Robbery | 20 years [3] |
| 2 | Joseph King [4] | First Degree Robbery | 20 years |
| | | Third Degree Burglary | 3 years [5] |
| | | Third Degree Burglary | Suspended |

| | | | |
|---|---|---|---|
| | | Third Degree Burglary | Suspended |
| | | Theft | Suspended |
| 3 | Derrick Jackson [6] | Second Degree Burglary | 10 years |
| | | Second Degree Burglary | 10 years |
| | | Theft | Suspended |
| 4 | Daniel Griffith [7] | Second Degree Conspiracy | 10 years |
| 5 | James Reed [8] | Second Degree Burglary | 8 years [9] |
| | | Third Degree Burglary | Suspended |
| 6 | Mark Berry [10] | Second Degree Burglary | 8 years [11] |
| 7 | David Matthews [12] | Possession of a Deadly Weapon by a Person Prohibited | 8 years |
| 8 | James Richardson [13] | Second Degree Burglary | 8 years [14] |
| 9 | Kevin Jamison [15] | Second Degree Robbery | 5 years |
| 10 | Michael Glenn [16] | Identity Theft | 5 years |
| | | Second Degree Forgery | Suspended |
| | | Second Degree Forgery | Suspended |
| 11 | Thurman Boston [17] | Second Degree Robbery | 5 years [18] |
| 12 | Leon Roane [19] | Third Degree Burglary | 3 years |
| 13 | Robert Cherry [20] | Carrying a Concealed Deadly Weapon | 2 years |
| 14 | Michael Dolan [21] | Theft > $1,000 | 2 years [22] |
| 15 | Terence Jones [23] | Failure to Reregister as a Sex Offender | 6 months |
| | | Theft > $1,000 | 2 years [24] |
| 16 | Thomas Wright [25] | Receiving Stolen Property > $1,000 | 2 years |
| 17 | Tyrone Redden [26] | Receiving Stolen Property > $1,000 | 2 years |
| 18 | Samuel Clayton [27] | Third Degree Burglary | 21 months |
| 19 | Daniel Jones [28] | Third Degree Burglary | Suspended |
| | | Second Degree Forgery | 18 months |
| 20 | Rudolph Reams [29] | Possession of a Deadly Weapon by a Person Prohibited | 1 year |
| 21 | Lefton Harmon [30] | Second Degree Conspiracy | 1 years |
| 22 | Teres Brown [31] | Second Degree Forgery | 1 year |
| 23 | Hakim Crawford [32] | Second Degree Escape | 9 months |
| 24 | Kenneth Jefferson [33] | Second Degree Escape | 6 months |
| 25 | Harold Harris [34] | Second Degree Forgery | 45 days |
| 26 | Jerome Jackson [35] | Second Degree Forgery | 30 days |

1. Only mandatory level–5 time is listed. Time required at other confinement levels is indicated in footnotes. Suspended time is not listed unless it is the only sentence handed down for a particular crime.
2. *Couch v. State,* Cs. No. 0104005738 (Del.Super. September 20, 2002) (unpublished decision).
3. Followed by 6 months at level 3.
4. *King v. State,* Cs. Nos. 0202010963, 0201002245 (Del.Super. September 4, 2002) (unpublished decision).
5. Sentence suspended upon completion of level 5 TEMPO treatment program.
6. *Jackson v. State,* Cs. No. 0008014266 (Del.Super. January 25, 2002) (unpublished decision).
7. *Griffith v. State,* Cs. No. 0012015221 (Del.Super. March 1, 2002).
8. *Reed v. State,* Cs. No. 0108003055 (Del.Super. February 15, 2002) (unpublished decision).

9. Followed by six months at level 4.
10. *Berry v. State*, Cs. No. 0011006393 (Del.Super. March 8, 2002) (unpublished decision).
11. Followed by six months at level 3.
12. *Matthews v. State*, Cs. 0108024999 (Del.Super. February 15, 2002) (unpublished decision).
13. *Richardson v. State*, Cs. No. 0012002187 (Del.Super. November 8, 2002) (unpublished decision).
14. Followed by 6 months at level 4.
15. *Jamison v. State*, Cs. No. 0105016859 (Del.Super. June 12, 2002) (unpublished decision).
16. *Glenn v. State*, Cs. Nos. 0103008294, 0108021782 (Del.Super. June 19, 2002).
17. *Boston v. State*, Cs. No. 0202008455 (Del.Super. September 10, 2002) (unpublished decision).
18. Followed by 6 months at level 3.
19. *Roane v. State*, Cs. Nos. 0201000217–5, 9910009093–17, 9907001791–12 (Del.Super. February 6, 2002) (unpublished decision).
20. *Cherry v. State*, Cs. No. 0112004800 (Del.Super. May 8, 2002) (unpublished decision).
21. *Dolan v. State*, Cs. No. 0107016904 (Del.Super. January 25, 2002) (unpublished decision).
22. Followed by 6 months at level 2.
23. *Jones v. State*, Cs. No. 0202012736 (Del.Super. June 18, 2002) (unpublished decision).
24. Sentenced to "2 year[s] at supervision level 5 KEY" treatment. Upon "successful completion" of KEY, balance of sentence suspended to 9 months at level 4 treatment, following which the remainder of the sentence is suspended.
25. *Wright v. State*, Cs. Nos. 0105020916–9, 0112010620–7, 9612013895–30 (Del.Super. March 21, 2002) (unpublished decision).
26. *Redden v. State*, Cr.A. No. IN02011142 (Del.Super. May 8, 2002) (unpublished decision).
27. *Clayton v. State*, Cs. No. 0203023601 (Del.Super. October 4, 2002) (unpublished decision).
28. *Jones v. State*, Cs. Nos. 0111018395–8, 0009005547–23, 0009017639–24 (Del.Super. May 10, 2002) (unpublished decision).
29. *Reams v. State*, Cs. No. 0206012525 (Del.Super. October 7, 2002) (unpublished decision). The only indication that Reams was sentenced as a habitual offender is on his Plea Agreement form.
30. *Harmon v. State*, Cs. Nos. 0110011415–13, 0111018628–12 (Del.Super. March 19, 2002) (unpublished decision).
31. *Brown v. State*, Cr.A. No. IN02050380 (Del.Super. May 30, 2002) (unpublished decision).
32. *Crawford v. State*, Cs. No. 0208017856 (Del.Super. October 16, 2002) (unpublished decision).
33. *Jefferson v. State*, Cs. No. 9903010580 (Del.Super. January 9, 2002) (unpublished decision).
34. *Harris v. State*, Cs. No. 0112002382 (Del.Super. September 23, 2002) (unpublished decision).
35. *Jackson v. State*, Cs. No. 0108019445 (Del.Super. June 7, 2002) (unpublished decision).